## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530,

                              *Plaintiff*,

     v.

ENTERCOM COMMUNICATIONS CORP.
401 E. City Avenue
Suite 809
Bala Cynwyd, PA 19004,

and

CBS CORPORATION
51 W. 52nd Street
New York, NY 10019,

                              *Defendants*.

## COMPLAINT

The United States of America brings this civil action to enjoin the proposed acquisition of CBS Radio, Inc. by Entercom Communications Corporation, and to obtain other equitable relief. The acquisition likely would substantially lessen competition for the sale of radio advertising to advertisers targeting English-language listeners in the Boston, Sacramento, and San Francisco Designated Market Areas ("DMAs"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The United States alleges as follows:

## I.     NATURE OF THE ACTION

1.      Pursuant to an Agreement and Plan of Merger dated February 2, 2017, between Entercom, CBS Radio, Inc. and CBS Corporation, Entercom agreed to acquire CBS Radio in a Reverse Morris Trust transaction valued at over $1.6 billion.  CBS Radio is a subsidiary of CBS Corporation.

2.      Entercom and CBS Radio own and operate broadcast radio stations in various locations throughout the United States, including multiple stations in Boston, Massachusetts, Sacramento, California, and San Francisco, California.  Entercom and CBS Radio compete head-to-head for the business of local and national companies that seek to advertise on English-language broadcast radio stations in these three DMAs.

3.      As alleged in greater detail below, the proposed acquisition would eliminate this substantial head-to-head competition in Boston, Sacramento, and San Francisco, and likely would result in advertisers paying higher prices for radio advertising.  Therefore, the proposed acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.     JURISDICTION, VENUE, AND COMMERCE

4.      The United States brings this action under the direction of the Attorney General and pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Entercom and CBS Corp. from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.      Entercom and CBS Corporation are engaged in interstate commerce and in activities substantially affecting interstate commerce.  They own and operate broadcast radio stations in various locations throughout the United States and sell radio advertising time on those

stations to advertisers located throughout the United States.  Defendants' radio advertising sales have a substantial effect upon interstate commerce.

6.      Defendants Entercom and CBS Corporation transact business in the District of Columbia and have consented to venue and personal jurisdiction in this District.  Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

### III.     THE DEFENDANTS

7.      Entercom, a Pennsylvania corporation with its headquarters in Bala Cynwyd, Pennsylvania, is the fourth-largest broadcast radio company in the United States.  It has a portfolio of 127 stations in 27 markets.  In 2016, Entercom reported net revenues of approximately $460 million.

8.      CBS Corporation is incorporated in Delaware and maintains its headquarters in New York, New York.  Its wholly-owned subsidiary, CBS Radio, owns 117 stations in 26 DMAs.  In 2016, CBS Radio reported net revenues of approximately $1.2 billion.

### IV.     RELEVANT MARKETS

9.       Entercom and CBS Radio sell radio advertising time to local and national advertisers that target English-language listeners in the Boston, Sacramento, and San Francisco DMAs.  A DMA is a geographical unit in which the Nielsen Company surveys radio listeners in order to furnish radio stations, advertisers, and advertising agencies with data to aid in evaluating radio audiences.  DMAs are widely accepted by industry participants as the standard geographic boundaries to use in evaluating radio audience size and demographic composition.  A radio station's advertising rates are directly related to the station's ability, relative to competing radio stations, to attract listeners within a DMA that have demographic characteristics that advertisers want to reach.

10.     The primary source of revenue for Entercom and CBS Radio is the sale of advertising time to local and national advertisers who want to reach listeners in one or more DMAs.  Advertising placed on radio stations in a DMA is aimed at reaching listening audiences located in that DMA, and radio stations outside that DMA do not provide effective access to these audiences.

11.     Local and national advertisers purchase radio advertising time because they find such advertising valuable, either by itself or as part of a broader mix of advertising on other media platforms.  Advertisers use broadcast radio for many reasons, including that radio advertising offers a high level of audience reach, as well as a stable listenership, and it is often a more efficient means than other advertising platforms to reach an advertiser's target audience at the desired frequency.  In addition, radio stations offer certain promotional opportunities to advertisers, such as on-air endorsements by local radio personalities, that advertisers cannot obtain as effectively using other media.

12.     Many local and national advertisers consider English-language broadcast radio to be a particularly effective or important means to reach their desired customers, and do not consider advertisements on other media, including non-English-language broadcast radio, digital music streaming services (such as Pandora), and television, to be reasonable substitutes.

13.     In addition, radio stations negotiate prices individually with advertisers; consequently, radio stations can charge different advertisers different prices.  Radio stations generally can identify advertisers with strong preferences to advertise on radio in a particular language in a specific DMA.  Because of this ability to price discriminate among customers, radio stations may charge higher prices to advertisers that view English-language radio advertising in a specific DMA as particularly effective for their needs, while maintaining lower

prices for more price-sensitive advertisers.  As a result, Entercom and CBS Radio could profitably raise prices to those advertisers that view English-language radio targeting listeners in the Boston, Sacramento, or San Francisco DMAs as an important advertising medium.

14.     If there were a small but significant and non-transitory increase in the price of radio advertising time on English-language stations in the Boston, Sacramento, and San Francisco DMAs, advertisers would not reduce their purchases sufficiently to render the price increase unprofitable.  Advertisers would not switch enough purchases of advertising time to radio stations outside the DMA, to other media, or to non-English-language radio stations to render the price increase unprofitable.

15.     Accordingly, the sale of broadcast radio advertising time to advertisers targeting English-language listeners is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.  The Boston, Sacramento, and San Francisco DMAs constitute relevant geographic markets within the meaning of Section 7 of the Clayton Act.

## V.     ANTICOMPETITIVE EFFECTS

16.     Post merger, radio station ownership in the Boston, Sacramento and San Francisco DMAs would be highly concentrated.  In each of these markets, a small number of station-group owners account for the bulk of the advertising revenues.  Entercom's and CBS Radio's combined advertising revenue shares would exceed 40% in San Francisco, 50% in Boston, and 55% in Sacramento.

17.      As articulated in the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission, the Herfindahl-Hirschman Index ("HHI") is a

measure of market concentration.[1]  Market concentration is often one useful indicator of the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that a transaction would result in a meaningful reduction in competition harming consumers.  Mergers resulting in highly concentrated markets (with an HHI in excess of 2,500) that involve an increase in the HHI of more than 200 points are presumed to be likely to enhance market power.

18.    Concentration in the Boston DMA would increase substantially as a result of the proposed acquisition: the post-acquisition HHI would exceed 3,600 for English-language broadcast radio stations, with an increase of over 1,200 points.

19.    Concentration in the Sacramento DMA would increase substantially as a result of the proposed acquisition: the post-acquisition HHI would exceed 4,300 for English-language broadcast radio stations, with an increase of over 1,600 points.

20.    Concentration in the San Francisco DMA would increase substantially as a result of the proposed acquisition: the post-acquisition HHI would exceed 2,800 for English-language broadcast radio stations, with an increase of over 800 points.

21.    In addition to increasing concentration, the merger also combines stations that are close substitutes and vigorous head-to-head competitors. Advertisers that use radio to reach their target audiences select radio stations on which to advertise based upon a number of factors including, among others, the size of a station's audience, its demographic composition, and the geographic reach of its broadcast signal.  Many advertisers select stations whose listening

---

[1] *See* U.S. Dep't of Justice, Horizontal Merger Guidelines § 5.3 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches a maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

audiences best correlate to their target audience. If a number of stations, or combinations of stations, broadcasting in the same DMA efficiently reach a particular target audience, advertisers benefit from the competition among those stations to offer better prices and other terms.

22. Entercom and CBS Radio, each of which operates multiple highly-rated radio stations in the Boston, Sacramento, and San Francisco DMAs, are important competitors for listeners and advertisers in those DMAs. From the perspective of many local and national advertisers buying radio advertising time in those DMAs, Entercom and CBS Radio are two of a limited number of station groups whose large and diverse listenership allows advertisers to meet their reach and frequency goals with respect to their target audience. Entercom and CBS Radio compete vigorously to win business from advertisers and substantially constrain each other's prices.

23. During individual negotiations between advertisers and radio stations, advertisers often provide the stations with information about their advertising needs, including their target audience and the desired frequency and timing of ads. Radio stations have the ability to charge advertisers differing rates based in part on the number and attractiveness of competitive radio stations that can meet a particular advertiser's specific target needs. During negotiations, advertisers can gain more competitive rates and other terms by "playing off" Entercom stations against CBS Radio stations, either individually or as a cluster. The proposed acquisition would end that competition, resulting in harm to advertisers.

24. Post-acquisition, if Entercom raised prices to those advertisers that buy advertising time on Entercom stations in the Boston, Sacramento and San Francisco DMAs, non-Entercom stations in those DMAs would likely respond with higher prices of their own rather than alter their existing formats to attract the Entercom stations' listeners and advertisers.

Repositioning a station by changing format is costly and risky, with the potential to lose substantial numbers of existing listeners and advertisers.  In addition, re-formatting is unlikely to attract in a timely manner sufficient listeners and advertisers to make a price increase unprofitable for Entercom.

25.     Due to FCC regulation, the lack of available spectrum, and other significant barriers, the entry of new broadcast radio stations into the Boston, Sacramento, and San Francisco DMAs would not be timely, likely, or sufficient to deter the exercise of market power.

26.     For all of these reasons, the effect of the proposed acquisition of CBS Radio by Entercom would likely be to lessen competition substantially in violation of Section 7 of the Clayton Act.

## VI.     VIOLATION ALLEGED

27.     Entercom's proposed acquisition of CBS Radio would likely substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and would likely have the following effects, among others:

a)   competition in the sale of advertising time on English-language broadcast radio stations in the Boston, Sacramento, and San Francisco DMAs would be substantially lessened;

b)   competition between Entercom broadcast radio stations and CBS broadcast radio stations in the sale of radio advertising time in the Boston, Sacramento, and San Francisco DMAs would be eliminated; and

c)   prices for advertising time on English-language radio stations in the Boston, Sacramento, and San Francisco DMAs would likely increase.

## VII.   REQUESTED RELIEF

28.   The United States requests that this Court:

a)   adjudge and decree Entercom's proposed acquisition of CBS Radio to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

b)   permanently enjoin and restrain the Defendants from carrying out the proposed acquisition or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine CBS Radio with Entercom;

c)   award the United States the costs of this action; and

d)   award such other relief to the United States as the Court may deem just and proper.

Dated: November 1, 2017

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

Makan Delrahim
Assistant Attorney General
Antitrust Division

Andrew C. Finch
Principal Deputy Assistant Attorney General
Antitrust Division

Donald G. Kempf, Jr.
Deputy Assistant Attorney General
Antitrust Division

Patricia A. Brink
Director of Civil Enforcement
Antitrust Division

Owen Kendler
Chief
Yvette Tarlov
Lisa Scanlon
Assistant Chiefs
Media, Entertainment, and Professional Services Section

Bennett J. Matelson* (D.C. Bar #454551)
Mark A. Merva (D.C. Bar #451743)
Lauren Riker
Adam Speegle
Jeffrey Vernon
United States Department of Justice
Antitrust Division
Media, Entertainment, and
Professional Services Section
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 616-5871
Facsimile:  (202) 514-7308
Email:  bennett.matelson@usdoj.gov

*Attorney of Record